IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

YOLANDA WILKINSON o/b/o      §
D.W.B. and A.N.B.            §
        Plaintiff,           §
                             §      CIVIL ACTION NO. H-09-1781
v.                           §
                             §
MICHAEL J. ASTRUE,           §
COMMISSIONER OF THE SOCIAL   §
SECURITY ADMINISTRATION,     §
                             §
        Defendant.           §

**<u>MEMORANDUM OPINION</u>**

Pending before the court[1] are Plaintiff's Motion for Summary
Judgment (Docket Entry No. 12) and Defendant's Motion for Summary
Judgment (Docket Entry No. 13).  The court has considered the
motions, all relevant filings, the administrative record, and the
applicable law.  For the reasons set forth below, Plaintiff's
Motion for Summary Judgment (Docket Entry No. 12) is **DENIED**, and
Defendant's Motion for Summary Judgment (Docket Entry No. 13) is
**GRANTED**.

## I.  Case Background

Plaintiff Yolanda Wilkinson ("Plaintiff"), substituting for
claimant Darryl[2] Benoit[3] ("Claimant") on behalf of their two minor

---

[1]    The parties consented to proceed before the undersigned magistrate
judge for all proceedings, including trial and final judgement, pursuant to 28
U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docket Entry Nos. 9 and
15.

[2]    Documents presented to the court are inconsistent with the spelling
of the claimant's name, which is also spelled as "Daryl" or "Darrell".  <u>See,
e.g.</u>, Plaintiff's Motion for Summary Judgment, Docket Entry No. 12, p. 2;
Transcript of the Administrative Proceedings ("Tr.") 26, 123, 171.

children, filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Claimant's claim for disability insurance benefits under Title II[4] of the Social Security Act ("the Act") and for supplemental security income benefits under Title XVI[5] of the Act.

## A.  Procedural History

Claimant filed for disability benefits on March 14, 2005, claiming an inability to work since June 30, 2004, as a result of back pain.[6]  After the application was denied at the initial and reconsideration levels,[7] he requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[8]  The ALJ granted Claimant's request and conducted a hearing in Houston, Texas, on February 22, 2007.[9]  After listening to testimony presented at the hearing and reviewing the medical

---

[3]     Claimant passed away on February 18, 2008.  Tr. 354.

[4]     42 U.S.C. § 401 et seq.

[5]     42 U.S.C. § 1381 et seq.

[6]     Tr. 106.

[7]     In his request for reconsideration, Claimant included cardiac problems. Tr. 62.

[8]     See Tr. 51-55.

[9]     Tr. 26-32, 309.

record, the ALJ issued an unfavorable decision on March 16, 2007.[10] The ALJ found Claimant was not disabled at any time during the period covered by his application, and Claimant appealed that decision to the Appeals Council on March 27, 2007.[11]

On July 23, 2007, the Appeals Council denied Claimant's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.[12] Claimant filed a timely civil action for judicial review of the Commissioner's unfavorable decision.

On June 6, 2008, Claimant contended before this court that the ALJ had failed to keep the record open for thirty days to accept post-hearing medical evidence as agreed during the hearing.[13] Subsequently, this court remanded to the Commissioner for reconsideration and further disposition, with instructions that the evidence submitted by Claimant before March 22, 2007, be considered by the ALJ.[14]

On January 29, 2009, the same ALJ who conducted the first hearing conducted a hearing to reconsider the medical evidence

---

[10]    See Tr. 14-22.

[11]    Tr. 10.

[12]    Tr. 3.

[13]    Tr. 328, 330.

[14]    Benoit v. Astrue, No. H-07-02939, 2008 WL 2368749 (S.D. Tex. June 6, 2008) (unpublished).

submitted by Claimant before March 22, 2007.[15]  On April 10, 2009, the ALJ issued a partially favorable ruling, finding that, based on the new evidence, Claimant was disabled with an onset date of February 28, 2007, but not as of June 30, 2004, as alleged by Claimant.[16]  Claimant filed this timely civil action for judicial review of the unfavorable portion of the Commissioner's decision.[17]

**B. Factual History**

### 1. Claimant's Age, Education, and Work Experience

Claimant was born on August 31, 1960, and was forty-six years old on the date of the ALJ's first decision.[18]  He claims he became unable to work on June 30, 2004.[19]  In addition to completing the ninth grade, Claimant obtained vocational training in building maintenance.[20]  Prior to the onset of his alleged disability, Claimant was employed as a cook for one year, a security guard for approximately two years, a janitor for two years, and a mover for six years.[21]

### 2. Claimant's and Plaintiff's Testimony

---

[15]     Tr. 357, 392.

[16]     Tr. 332.

[17]     "[T]he decision of the [ALJ] becomes the final decision of the Commissioner after remand."  20 C.F.R. § 404.984(d) (2008).

[18]     Tr. 22, 97.

[19]     Tr. 97.

[20]     Tr. 111.

[21]     Tr. 107.

During the first hearing, the ALJ solicited testimony from Claimant, his mother, a medical expert ("ME"),[22] and a vocational expert ("VE").[23]   Claimant testified to suffering from heart pain, stating he would require revision surgery for a previous heart valve replacement.[24]   Claimant further testified that he suffered from back pain in his lumbar spine.[25]

Regarding his physical activities, Claimant stated that he had to rest after walking a block.[26]   Claimant testified that he could not play with his children without becoming tired and having to sit down because of his heart pain.[27]   He also testified that prolonged sitting or standing caused him back pain.[28]   Furthermore, Claimant stated that he was unable to lift more than five pounds.[29]

During the second hearing, the ALJ solicited testimony from Plaintiff, the same ME as the first hearing,[30] and a different VE.[31] Plaintiff generally reported that Claimant had difficulty walking,

---

[22]    See Tr. 312-317.

[23]    See Tr. 328-329.

[24]    Tr. 320-21.

[25]    Tr. 323.

[26]    Tr. 322.

[27]    Id.

[28]    Tr. 323.

[29]    Id.

[30]    See Tr. 393-396.

[31]    See Tr. 398-399, 403-405.

breathing, and playing with his children.[32]  Specifically, Plaintiff

stated that, although she lived only three blocks away from

Claimant, he could not walk a block toward her house before tiring

and needing assistance.[33]  Plaintiff testified that Claimant would

call her and tell her he was feeling bad and was having difficulty

breathing.[34]  Additionally, she testified that Claimant cried when

he had difficulty holding and lifting his children.[35]

### 3. Medical Records

On March 9, 2001, Claimant complained of lower back pain in

relation to an injury suffered on January 31, 2001.[36]  On November

14, 2001, Claimant was evaluated by Troy Clark, D.C., ("Dr. Clark)

a representative of the Texas Workers' Compensation Commission.

Claimant continued to complain of lower back pain, resulting in

sleep loss and occasional pain radiating down his right anterior

thigh.[37]  Dr. Clark found that Claimant had fully recovered from his

back injury and considered Claimant's behavior inconsistent with

his description of his pain and related symptoms.[38]  Dr. Clark

assigned Claimant a Whole Person Impairment (WPI) of zero percent

---

[32]     Tr. 400-401.

[33]     Tr. 400.

[34]     Id.

[35]     Tr. 402.

[36]     Tr. 132-33.

[37]     Tr. 118.

[38]     Tr. 120.

and advised that Claimant was capable of returning to full work duties.[39]

On February 10, 2005, Claimant was admitted to the Christus St. Joseph Hospital emergency room, complaining of chest pain.[40] On April 6, 2005, Claimant underwent heart valve replacement surgery at The Methodist Hospital.[41]   The surgery repaired a saccular aneurysm at the aortimitral junction and required the replacement of Claimant's aortic valve.[42] Post-surgery examinations revealed that Claimant's heart remained significantly enlarged.[43] Further examinations six days after the surgery found Claimant's left ventricle severely enlarged and functionally depressed.[44] Claimant's ejection fraction[45] in his left ventricle was between twenty and twenty-five percent.[46]  Claimant was discharged on April 15, 2005.[47]

On April 25, 2005, Claimant was re-admitted to The Methodist

---

[39]    Id.

[40]    Tr. 159.

[41]    Tr. 235.

[42]    Tr. 238.

[43]    Tr. 244.

[44]    Tr. 240.

[45]    An ejection fraction is "the proportion of blood that is ejected during each ventricular contraction compared with the total ventricular volume." Mosby's Pocket Dictionary of Medicine, Nursing, & Allied Health 306 (N. Darlene Como ed., The C.V. Mosby Co. 1990).

[46]    Tr. 240.

[47]    Tr. 238.

Hospital, complaining of a sudden onset of diffuse weakness of a moderate intensity and of a decreased ability to stand and walk.[48] Rutherford Huey, M.D., stated that Claimant's heart was enlarged and that his diaphragm and cardiac margin were obscured.[49]   The Methodist Hospital diagnosed Claimant with acute hypotension and weakness.[50]

On May 16, 2005, Claimant received an echocardiogram at Ben Taub Hospital to determine the status of his heart following his surgery.[51]   Claimant's left ventricle remained dilated, and its function was severely reduced.[52]   On May 22, 2005, Claimant was re-evaluated at Ben Taub Hospital regarding his ventricular function and valves.[53]   While Claimant's left ventricle remained enlarged, Ben Taub Hospital's echocardiography test reported that his ejection fraction had improved to between forty and forty-four percent, meaning that the ventricular function was only mildly reduced.[54] While recognizing improvement in the left ventricle, the interpretation summary stated that an abnormal flow remained in the

---

[48]    Tr. 169.

[49]    Tr. 171.

[50]    Tr. 177.

[51]    Tr. 255.

[52]    Id.

[53]    Tr. 253.

[54]    Id.

left ventricle outflow tract into the left atrium.[55]

On August 22, 2005, Claimant met with Manoj Vakil, M.D., ("Dr. Vakil") at the Northwest Medical Clinic in Houston, Texas.[56] Claimant complained of "tightness in the chest since surgery in [April] 2005."[57] Claimant reported that he became breathless after walking a block and that his pain increased if he sat or stood in one position for thirty minutes without support.[58] Dr. Vakil stated that he believed Claimant's chest pain was related to his recent surgery and that Claimant's "shortness of breath could be due to cardiomegaly."[59]

Claimant received a Residual Functional Capacity ("RFC") Assessment, completed by Scott Spoor, M.D., ("Dr. Spoor") on August 29, 2005, to evaluate Claimant's recovery from his April heart surgery.[60]  Dr. Spoor's assessment stated that Claimant could occasionally lift fifty pounds, could frequently carry twenty-five pounds, and could sit or stand for about six hours in an eight-hour workday.[61]  Dr. Spoor noted that Claimant suffered from an enlarged

---

[55]     Tr. 254.

[56]     Tr. 178.

[57]     Id.

[58]     Id.

[59]     Tr. 180.

[60]     Tr. 182-89.

[61]     Tr. 183.

heart and chest pain related to his recent surgery.[62]

Claimant received a referral for valve repair or replacement surgery from the Cardiology Clinic at the Harris County Hospital District on February 28, 2007.[63]  An echocardiography report dated March 13, 2007, supported the referral because it suggested possible "prosthetic valve dysfunction."[64]

On October 12, 2007, Claimant underwent aortic revision surgery without complications and was discharged six days later from The Methodist Hospital.[65]  However, a letter from John Volpi, M.D., ("Dr. Volpi") on December 7, 2007, indicated that Claimant suffered two strokes during the two weeks prior to the letter.[66] Dr. Volpi indicated that the first stroke affected Claimant's left face and arm, but recovery was significant.[67]  The second stroke affected Claimant's right side, and recovery was uncertain.[68]

Claimant died on February 18, 2008.  The death certificate listed the cause of death as "acute myocardial [infarction], coronary artery disease, and hypertension."[69]

---

[62]    Id.

[63]    Tr. 381.

[64]    Tr. 383.

[65]    Tr. 385, 388.

[66]    Tr. 389.

[67]    Id.

[68]    Id.

[69]    Tr. 354.

### 4. ME's Testimony

Based on his review of the medical evidence, the ME testified at the first hearing that Claimant had a history of heart problems.[70]   The ME summarized Claimant's remaining symptoms but noted that Claimant's ejection fraction had improved since his surgery.[71]   The ME stated that based on the record, there was no evidence that a revision surgery was necessary.[72]

The ME next evaluated whether Claimant met specific Listing(s) ("Listing" or "Listings").[73]   The ME first analyzed whether Claimant's condition met the established criteria for Listing 4.10 for aneurysm of the aorta or other branches.[74]   The ME noted that while Claimant may have at one time met Listing 4.10, he had improved since his surgery and would no longer meet it.[75]   The ME stated that if Claimant required additional surgery, he would meet Listing 4.10.[76]

The ME also considered Claimant's symptoms to be less than

---

[70]   Tr. 314.

[71]   Tr. 313-14.

[72]   Tr. 314.

[73]   "Listings" refer to impairments listed in Appendix 1 of the Act's regulations.   20 C.F.R. Pt. 404, Subpt. P, App. 1 (2009).

[74]   Tr. 315.

[75]   Id.

[76]   Id.

11

those required to meet Listing 4.02 for chronic heart failure.[77]
Claimant's low ejection fraction from his early post-surgery
cardiogram was only between twenty and twenty-four percent, which
was low enough to meet Listing 4.02's requirement of thirty percent
or less.[78]  The ME noted, however, that Claimant's ejection fraction
had since improved to around forty percent, which did not meet the
requirements for Listing 4.02.[79]  The ME noted that Claimant had an
enlarged left ventricle but found that Claimant's symptoms still
failed to meet the criteria of Listing 4.02.[80]  The ME recognized
that critical information relating to Claimant's most recent visit
to the clinic was missing and that this information could determine
whether Claimant required a revision surgery.[81]

The ME also considered whether Claimant's back condition met
Listing 1.04 for disorders of the spine.[82]  The ME summarized
Claimant's back injury as a herniation of L4/L5 and L5/S1 discs of
the lumbar spine.[83]  Fusion surgery had been recommended following
the original 2001 injury but was not authorized by Claimant's

---

[77]     Id.

[78]     Id.

[79]     Id.

[80]     Tr. 317.

[81]     Tr. 316.

[82]     Id.

[83]     Id.

worker's compensation benefits.[84]  The ME compared Claimant's injury
against Listing 1.04, noting that Claimant did not meet criteria A[85]
because there was no evidence of nerve root compression or
decreased motor sensory movement and because Claimant could still
ambulate.[86]  The ME stated that criteria B[87] had been met for a
period in 2001, after Claimant's initial disc herniation, but did
not last for the necessary period to qualify for disability.[88]

During the second hearing, the same ME who presented testimony
at the first hearing determined that Claimant was disabled as of
February 28, 2007, based on the findings of the February 28, 2007,
medical report that referred Claimant for revision surgery.[89]  The
ME concluded that Claimant was not disabled between June 30, 2004,
and February 28, 2007, based on the evidence.[90]  Specifically, the
ME  pointed out that Claimant did not "have any significant heart

---

[84]     Id.

[85]     See Listing 1.04(A), 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2009)
("Evidence of nerve root compression characterized by neuro-anatomic distribution
of pain, limitation of motion of the spine, motor loss (atrophy with associated
muscle weakness) accompanied by sensory or reflex loss and, if there is
involvement of the lower back, positive straight-leg raising test (sitting and
supine).").

[86]     Tr. 316.

[87]     See Listing 1.04(B), 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2009)
("Spinal arachnoiditis, confirmed by an operative note or pathology report of
tissue biopsy, or by appropriate medically acceptable imaging, manifested by
severe burning or painful dysesthesia, resulting in the need for changes in
position or posture more than once every 2 hours.").

[88]     Tr. 316.

[89]     Tr. 394-395.

[90]     Id.

failure" after his 2005 heart surgery.[91]  Additionally, the ME gave Claimant an RFC of "light" during the period after healing from the first surgery and before the February 28, 2007, medical report based on Claimant's recovery and the substantiating medical evidence.[92]

### 5.  VE's Testimony

After reviewing the file and listening to Claimant's testimony, the VE stated during the first hearing that Claimant could continue to perform sedentary, unskilled work.[93]

The ALJ asked the VE if a hypothetical individual of Claimant's age, educational background, and work history could perform certain jobs, assuming that the individual would also be restricted to: 1) lifting and/or carrying five-to-ten pounds occasionally; and 2) sitting approximately six hours in an eight-hour day and standing and/or walking with normal breaks for approximately two hours in an eight-hour day.[94]

Presented with this hypothetical, the VE opined that such an individual would be able to perform sedentary, unskilled work.[95] According to the VE, the individual could work as a surveillance

---

[91]    Tr. 394.

[92]    Tr. 396.

[93]    Tr. 329.

[94]    Tr. 328.

[95]    Tr. 329.

system monitor, optical goods worker, or a final assembler.[96]  Each of these positions was available in significant numbers in both the regional and national economies.[97]

At the second hearing, the ALJ asked the VE if a hypothetical individual of Claimant's age, educational background, and work history could perform certain jobs assuming that the individual would be restricted to: 1) lifting and/or carrying five pounds frequently and ten pounds occasionally; and 2) standing or walking two hours in an eight-hour day with normal breaks, or sitting for six hours in an eight-hour day with normal breaks.[98]

Presented with this hypothetical, the VE opined that a person could not do the past work of Claimant but that there would be other work available in the regional or national economy.[99] According to the VE, the individual could work as a final assembler, sorter, or telephone solicitor.[100]  Each of these positions was available in significant numbers in both the regional and national economies.[101]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to

---

[96]    Id.

[97]    Id.

[98]    Tr. 403.

[99]    Id.

[100]   Tr. 403-404.

[101]   Tr. 404.

deny disability benefits is limited to two issues: 1) whether substantial record evidence supports the decision; and 2) whether proper legal standards were used to evaluate the evidence. <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002); <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000); <u>Brown</u>, 192 F.3d at 496.   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496.  The Commissioner is given the responsibility of deciding any conflicts in the evidence.   <u>Id.</u>   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405 (g).   Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making the court's review meaningless. <u>Brown</u>, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and RFC must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving he is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth. Brown, 192 F.3d at 498; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled. Greenspan, 38 F.3d at 236.

## III. Analysis

### A.  Plaintiff's Argument

Plaintiff moves for summary judgment and reversal of the ALJ decision setting the onset date of disability as February 28, 2007, rather than June 30, 2004, as alleged by Claimant.[102]  Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to consider Social Security Ruling 83-20 ("SSR 83-20") to determine the onset date of disability.[103] See SSR 83-20, 1983 WL 31249 (S.S.A. 1983).

SSR 83-20 states that "lay statements concerning the claimant's activities and the work record [should be] consistent with a physician's assessment."  SSR 83-20, at *3. The ALJ should also call on the ME to help determine the onset date, especially when onset must be inferred.  Spellman v. Shalala, 1 F.3d 357, 361 (5th Cir. 1993).

Plaintiff alleges that SSR 83-20 gives an example factually similar to the instant case.[104]  There, a hypothetical claimant was found to meet a Listing and the onset date was established to be approximately one year prior to available medical records based on consistent employer testimony, a neighbor's testimony, a physician's review, and the work record.  SSR 83-20, at *3.  The

---

[102]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 12, p. 9.

[103]    Id. at 8.

[104]    Id.

example in SSR 83-20 is distinguishable from the instant case, however, because, here, the ME review of the medical records was inconsistent with the lay testimony.[105]   Furthermore, the lay testimony here consists of interested witnesses: Claimant, his mother, and Plaintiff.[106]

The ALJ's decision to establish the onset date as February 28, 2007, is supported by the ME's testimony.[107]  The ME determined that Claimant was disabled as of February 28, 2007, based on the findings of the February 28, 2007, medical report that referred Claimant for revision surgery.[108]  Since this case was previously remanded by this court,[109] the additional medical evidence prior to March 22, 2007, was considered.[110]  The ALJ reviewed the evidence and considered testimony regarding Claimant's alleged onset date, other lay testimony, and work history, including the last date of employment; however, he did not find the factors persuasive when compared with the ME's and VE's testimony which were supported by the medical evidence.[111]  The ALJ based his decision on the findings

---

[105]   Tr. 393-397.

[106]   Tr. 318-328, 330, 392, 399-402.

[107]   Tr. 394-395.

[108]   Tr. 395.

[109]   Benoit v. Astrue, No. H-07-02939, 2008 WL 2368749 (S.D. Tex. June 6, 2008) (unpublished).

[110]   Tr. 381, 394-395.

[111]   Tr. 393-396, 398-99, 403-405.

19

of the ME who determined that the onset date was February 28, 2007, based on the medical reports stating that additional surgery was required for Claimant's heart.[112]

Here, the ALJ's decision is supported by substantial evidence. The testimony of Claimant, his mother, and Plaintiff does not necessarily indicate a June 30, 2004, onset date.   Further, Plaintiff suggests that Claimant's death establishes the disability;[113] however, his death does not shed light on the onset date.

Accordingly, the court **DENIES** Plaintiff's motion for summary judgment.

## B. Defendant's Argument

Defendant asserts in his response that the ALJ's decision should be affirmed because the ALJ properly determined from the evidence that Claimant's disability was not established before February 28, 2007.[114]

The court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance of evidence. See Carey, 230 F.3d at 135.   The court finds more than a scintilla of evidence in support of the ALJ's decision.   Therefore, the court

---

[112]    Tr. 381.

[113]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 12, p. 9.

[114]    Tr. 338; Defendant's Motion for Summary Judgment, Docket Entry No. 13.

cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991).

For the reasons stated above, the court finds Defendant satisfied his burden. As a result, the ALJ's decision finding Claimant not disabled before February 28, 2007, is supported by substantial evidence. The court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination. Therefore, the court affirms the Commissioner's decision.

Accordingly, the court **GRANTS** Defendant's motion for summary judgment.

### IV. Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment (Docket Entry No. 12) is **DENIED.** Defendant's Motion for Summary Judgment (Docket Entry No. 13) is **GRANTED,** and the decision of the Commissioner is thereby affirmed**.**

**SIGNED** at Houston, Texas, this 17th day of June, 2010.

Nancy K. Johnson
United States Magistrate Judge

21